**FILED**
TD
12/11/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint            Trial Attorney Patrick Mott (202) 664-3486

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER:    25 CR 791 |
| v. | |
| MIR SAJID ALI SUFIYAN | |

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

On or about April 22, 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, MIR SAJID ALI SUFIYAN, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1347 | did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Blue Cross Blue Shield of Illinois, a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, by submitting and causing to be submitted, a claim for the provision of COVID testing services to beneficiary AB2, when such services were not provided. |

3

<u>Count Two</u>

On or about April 24, 2024, at Chicago, in the Northern District of Illinois, Eastern

Division, and elsewhere, MIR SAJID ALI SUFIYAN, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1956(a)(1)(B)(i) | did knowingly conduct a financial transaction, namely, a withdrawal of $293,000 from the account ending x2248 at U.S. Bank in the name of Clear Labs, LLC, which involved the proceeds of a specified unlawful activity, namely, health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that the transaction was designed in whole and in part to conceal the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity. |

This criminal complaint is based upon these facts:

   <u>X</u>   Continued on the attached sheet.

Tony Benka
Special Agent, FBI

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: <u>December 11,  2025</u>

*Judge's signature*

City and state: <u>Chicago, Illinois</u>   <u>Keri L. Holleb Hotaling, U.S. Magistrate Judge</u>
                                        *Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**<u>AFFIDAVIT</u>**

I, Tony P. Benka, being duly sworn, state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Chicago Division. I have been so employed since approximately August of 2020.

2. My duties and responsibilities as an FBI Special Agent include conducting criminal investigations of individuals and organizations that have violated federal laws, including violations relating to white collar crime, such as Title 18, United States Code, Sections 1347 (health care fraud) and 1956 (money laundering). I also investigate allegations of fraud, waste, and abuse in connection with federal and state health care programs, including Medicare and Medicaid. Through my training and experience, I have become familiar with the methods by which individuals and entities conduct health care fraud and the techniques used to investigate these offenses, including consensual monitoring, surveillance, data analysis, and conducting interviews of witnesses, informants, and others who have knowledge of fraud perpetrated by health care providers. I have participated in the execution of numerous federal search warrants and arrests.

1

3.     This affidavit is made in support of a criminal complaint alleging MIR SAJID ALI SUFIYAN ("SUFIYAN") has committed the offenses of health care fraud, in violation of Title 18, United States Code, Section 1347, and money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i). As described in more detail below, there is probable cause to believe that SUFIYAN: (1) knowingly and willfully defrauded Blue Cross and Blue Shield of Illinois ("BCBS-IL"), a federal health care benefit program, by causing to be submitted false and fraudulent claims for reimbursement for COVID-19 testing services purportedly provided to BCBS members, which were never provided; and (2) knowingly conducted financial transactions involving proceeds of those fraudulent claims to BCBS with the intent to conceal the nature, location, source, ownership or control of the proceeds.

4.     Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SUFIYAN with health care fraud and money laundering, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that SUFIYAN committed the offenses alleged in the complaint.

5.     This affidavit is based on my personal knowledge and observations, my training and experience, information provided to me by other law enforcement agencies, information I have received from various business records and searches of public and governmental databases, other interviews I conducted, and documents and records gathered in the investigation.

2

6.      As set forth in more detail below, from in or around February 2024 through in or around November 2024, BCBS-IL received approximately 56,938 claims from CLEAR LABS, LLC ("CLEAR LABS") seeking approximately $29.6 million for COVID-19-related laboratory testing services CLEAR LABS purportedly provided to BCBS-IL members between January 2023 and March 2024. According to BCBS-IL records, BCBS-IL made approximately $1.7 million in payments to CLEAR LABS based on those claims. Based on CLEAR LABS bank records, contemporaneous visits to CLEAR LABS by a BCBS-IL investigator and a Centers for Medicare and Medicaid Services ("CMS") surveyor, interviews of BCBS-IL members, the interview of CLEAR LABS' lab director, and interviews of neighbors of CLEAR LABS, CLEAR LABS was not operational during times when CLEAR LABS claimed it was conducting the vast majority of the testing and BCBS-IL members did not receive the testing services that CLEAR LABS billed to BCBS-IL.

7.      Based on regulatory filings SUFIYAN signed and caused to be submitted on behalf of CLEAR LABS identifying himself as CLEAR LABS' owner and manager, bank records showing SUFIYAN opened and served as the sole signatory for at least five CLEAR LABS bank accounts (all of which were largely inactive in the months leading up to the submission of the fraudulent claims), records identifying SUFIYAN as the authorized user for CLEAR LABS' account with the clearinghouse it used to submit claims to BCBS-IL, records showing that the checks from BCBS-IL made out to CLEAR LABS as payment on the fraudulent claims were deposited into CLEAR LABS' accounts for which SUFIYAN was the sole signatory (frequently with

SUFIYAN's signature on the endorsement line), bank records showing SUFIYAN rapidly moved fraud proceeds out of the CLEAR LABS accounts and into other accounts he controlled in the names of entities SUFIYAN falsely described to banks as "clothing" companies, and bank records showing SUFIYAN used fraud proceeds to purchase cashier's checks to third parties with bogus references to "Inventory" in the memo lines, I believe SUFIYAN knowingly participated in the scheme to defraud BCBS-IL, including by causing the submission of fraudulent claims to BCBS-IL, and knowingly conducted financial transactions involving proceeds of the fraudulent claims with the intent to conceal the nature, location, source, ownership, and/or control of the proceeds.

## II.  BACKGROUND INFORMATION

### A.  Background on CLEAR LABS

8.  According to information provided by the Illinois Secretary of State ("IL-SOS"), CLEAR LABS was incorporated on or about October 21, 2021, and was involuntarily dissolved on or about April 11, 2025, after failing to file its 2024 annual report. Prior to its dissolution, on or about November 1, 2023, CLEAR LABS submitted an "Articles of Amendment" form to the IL-SOS Office, signed by SUFIYAN as CLEAR LABS' manager, identifying SUFIYAN as CLEAR LABS' registered agent and sole manager, with an address listed as 6318 N. Cicero Avenue in Chicago, Illinois. From October 2021 through June 2023, CLEAR LABS' filings

with IL-SOS had identified its place of business as 5666 North Lincoln Avenue in Chicago and Individual 1 as one of CLEAR LABS' managers.[1]

9. According to the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS"), CLEAR LABS became a registered provider with Medicare effective on or about January 19, 2022. According to Medicare's Application Data Report (ADR), SUFIYAN was added as the sole "Authorized Official," and sole "President," on or about February 29, 2024.

10. On or about February 2, 2022, a BCBS-IL enrollment form was submitted for CLEAR LABS, identifying an individual, Individual 4, as the "Billing Manager." A separate individual was listed as the "Office Contact Name." On or about February 15, 2024, a BCBS-IL enrollment form was submitted for CLEAR LABS, listing SUFIYAN as the "President" and "Office Contact Name." The address was updated to reflect 6318 N. Cicero Avenue.

11. Based on information I received from BCBS-IL, I know that CLEAR LABS utilized an entity called "Office Ally" as a clearinghouse for billing submissions.[2] An investigator from BCBS-IL explained that generally, a lab such as

---

[1] On or about October 5, 2023, CLEAR LABS submitted an annual report to IL-SOS identifying Individual 2 as its new sole manager. On or about October 13, 2023, CLEAR LABS submitted Articles of Amendment to IL-SOS identifying Individual 3 as its new sole manager and registered agent and 6318 N. Cicero Avenue in Chicago as its new principal place of business. Individual 1 is currently charged by indictment with bank fraud in the Northern District of Illinois in a case involving allegations unrelated to CLEAR LABS. Individual 3 bears the same name as someone who is currently charged by complaint with health care fraud and engaging in monetary transactions involving $10,000 or more in criminally derived property in the Northern District of Illinois in a case involving fraudulent claims submitted by a different laboratory.

[2] According to Office Ally's website, https://cms.officeally.com/products/edi-clearinghouse, Office Ally's EDI Clearinghouse facilitates clean EDI transactions to ensure smarter, faster,

CLEAR LABS entered billing data into a database. Office Ally then pulled the data from the database and submitted the billing claims to BCBS-IL through a program called Availity, a vendor used by BCBS-IL.

### B. Background on BCBS-IL

12. Based on my training and experience, the training and experience of other law enforcement officers, and my review of pertinent documents and records, I know that medical providers seeking participation and reimbursement from private health insurance companies, such as BCBS-IL, enter into provider participation agreements with the insurance companies from which they seek reimbursement. Under these agreements, providers generally agree to comply with all federal and state laws, maintain necessary licensure and certification, create and maintain truthful and accurate patient records sufficient to justify claims for services rendered to patients, and disclose these records on request of the insurance company. Private insurance companies generally agree to pay providers in a timely manner for medically necessary services that are actually rendered and covered under the insured's plan or policy. The amount of the provider's reimbursement is typically based on a fee schedule that the provider agrees to accept as full payment for the covered service.

13. Further, when a claim for medical services is submitted to a health care benefit program such as BCBS-IL, the specific dollar amount (if any) that the health care benefit program will pay on that claim depends on various factors, including: the

---

and easier payments for healthcare organizations of all sizes through secure, flexible integration.

medical procedure performed, the location in which the procedure was provided, whether that procedure was covered by the program, and the amount of the coverage offered by the program for that procedure. This process also assumes that the services identified in the claim were actually provided.

14.     Most health care benefit programs, including BCBS-IL, utilize a national coding practice for payment of claims that relies on the American Medical Association ("AMA") Physicians' Current Procedural Terminology ("CPT") system, which is published in the AMA Current Procedural Terminology ("CPT Manual"). The CPT Manual lists descriptive terms and identifying codes (*i.e.* CPT Codes) for reporting medical services and procedures performed by providers.

15.     BCBS-IL is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

### C.     Background on Relevant CPT Codes and Medical Processes

16.     The investigation established that CLEAR LABS billed BCBS-IL for services not rendered. Virtually all of the billing at issue related to three particular services, each categorized by its respective CPT code:

- **87637** – The CPT 2023 ("CPT 2023 Code Book") defines this code as "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (Coronavirus disease [COVID-19]), influenza virus types A and B, and respiratory syncytial virus, multiplex amplified probe technique."

- **87913** – The CPT 2023 Code Book defines this code as "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (coronavirus disease [COVID-19]), mutation identification in targeted region(s)."

- **86328** – The CPT 2023 Code Book defines this code as "Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (Coronavirus disease [COVID-

7

19])."

17.     Based on my training and experience with investigating COVID-19 testing laboratories, and through information I learned from an interview with an independent laboratory consultant, I am aware that CPT Codes 87637 and 87913 utilize the collection of bodily fluid specimens from a patient through the use of nasal swabs. CPT Code 86328 requires the testing of a patient's blood, generally obtained through a medical instrument such as a finger poke device. A nasal swab would be inadequate for testing under this CPT Code. The purpose of this procedure is to detect antibodies, which would indicate that a patient was previously infected with a particular virus (in this case, coronavirus).

18.     Through an interview with an independent laboratory consultant, I am aware that laboratories that legitimately conduct significant volumes of these types of procedures would be expected to have certain medical supplies and machinery available to complete the testing. Additionally, a medical director would then read the test to make a determination on the result.

19.     According to the independent laboratory consultant, the pipetting process was typically the "stovepipe" of the lab-testing process. Laboratories that were equipped with automated pipetting machinery are able to process a larger volume of specimens in a shorter period of time. Without automated pipetting machinery, the pipetting process is completed individually by hand. The independent laboratory consultant estimated that, without this machinery, it would take a single individual approximately 18 hours to complete the pipetting process for 2,500

specimens. Additionally, the number of PCR machines would also have an effect on the number of specimens that could be processed by a single laboratory in a single day.

### III. FACTS ESTABLISHING PROBABLE CAUSE

#### A. CLEAR LABS Submitted Fraudulent Claims to BCBS-IL for Laboratory Testing Services That Were Not Provided.

20. As described above and below, in or around February 2024, CLEAR LABS submitted an enrollment application to BCBS-IL identifying SUFIYAN as CLEAR LABS' president and purporting to bear SUFIYAN's electronic signature. That same month, CLEAR LABS began submitting thousands of claims to BCBS-IL for COVID testing services (CPT Codes 86328, 87637, and 87913), with dates of service ranging from January 2023 through February 2024. CLEAR LABS continued submitting claims for COVID testing services to BCBS-IL through November 2024, with dates of service continuing through March 2024. Soon after it started receiving claims and issuing explanations of benefits ("EOBs") to patients, BCBS-IL began receiving complaints from patients who stated they had not received any lab testing services from CLEAR LABS and that the tests reflected on their EOBs had never been performed.

21. A BCBS-IL investigator conducted a site visit of CLEAR LABS on or about February 16, 2024, and found that the premises was empty. When a CMS surveyor attempted to inspect CLEAR LABS on or about March 3, 2024, the surveyor was not permitted to enter the facility. According to CLEAR LABS' lab director, CLEAR LABS had never been set up to process tests and should not have been

submitting claims for testing. Illinois Department of Employment Security ("IDES") records show CLEAR LABS was not making any payments to employees, and CLEAR LABS' bank records show virtually no activity in the CLEAR LABS accounts until BCBS-IL payments were deposited into the accounts, even though CLEAR LABS claimed to be processing thousands of tests per month during that period.

22.     As set forth in greater detail below, based on interviews with BCBS-IL members and BCBS-IL members' hotline complaints, the site visits to CLEAR LABS, the statements of CLEAR LABS' lab director, IDES records, and CLEAR LABS' bank records, CLEAR LABS appears to have been non-operational, and all of the claims CLEAR LABS submitted to BCBS-IL appear to have been false and fraudulent.

*Billing Patterns and Claims Data Analysis*

23.     BCBS-IL claims data indicates that, from February 2024 through November 2024, BCBS-IL received approximately $29,618,032.24 in billing claims from CLEAR LABS for services under CPT Codes 86328, 87637, and 87913. According to BCBS-IL claims data, CLEAR LABS was paid approximately $1,748,327.78 for these claims.[3] As discussed further below, CLEAR LABS received payment on the claims in the form of paper checks from BCBS-IL and from Health Care Service Corporation ("HCSC"), which, according to BCBS-IL records and an interview with a BCBS-IL representative, is a division of HCSC. To date, law enforcement has obtained CLEAR LABS bank records reflecting deposits of checks from BCBS-IL and

---

[3] According to BCBS-IL claims data, BCBS-IL received a total of approximately three claims from CLEAR LABS seeking a combined total of approximately $440.77 for CPT codes other than 86328, 87637, and 87973. According to BCBS-IL claims data, BCBS-IL made no payment on any of those claims.

HCSC made as payment on the above-referenced CLEAR LABS claims with a total value of approximately $1,470,652.[4]

24.     Starting in February 2024, when CLEAR LABS identified SUFIYAN as its President, CLEAR LABS began billing for CPT Codes 86328, 87637, and 87973, at an extraordinary rate. Prior to that point, BCBS-IL had not received any claims from CLEAR LABS relating to any of those three CPT codes. BCBS-IL continued to receive claims from CLEAR LABS each month through November 2024. This billing pattern is shown in greater detail in Table 1 below:

**TABLE 1**

| Received Date (Month/Year) | Number of Claims Received by BCBS-IL | Total Amount Billed | Total Amount Paid |
|---|---|---|---|
| November 2023 | 0 | $0 | $0 |
| December 2023 | 0 | $0 | $0 |
| January 2024 | 0 | $0 | $0 |
| February 2024 | 12,196 | $6,345,865.09 | $1,399,402.21 |
| March 2024 | 40,126 | $20,867,420.70 | $236,079.11 |
| April 2024 | 3,824 | $1,988,283.31 | $44,265.33 |
| May 2024 | 371 | $192,916.29 | $63,096.83 |
| June 2024 | 138 | $71,362.52 | $568.32 |
| July 2024 | 89 | $49,746.54 | $3,637.12 |
| August 2024 | 131 | $69,678.58 | $0 |
| September 2024 | 59 | $30,679.25 | $1,278.86 |
| October 2024 | 3 | $1,559.97 | $0.00 |
| November 2024 | 1 | $519.99 | $0.00 |
| Total | 56,938 | $29,618,032.24 | $1,748,327.78 |

---

[4] Law enforcement is working with BCBS-IL to attempt to determine the discrepancy between the paid amount reflected in the BCBS-IL claims data and the value of the BCBS-IL and HCSC checks deposited into CLEAR LABS bank accounts, which could result from, among other things, CLEAR LABS receiving but not depositing certain checks or CLEAR LABS depositing checks into accounts that law enforcement has not yet located.

25.     Moreover, the claims submitted for CPT Codes 86328, 87637, and 87973 by CLEAR LABS were for services that were purportedly provided to BCBS-IL members beginning almost twelve months prior to the submission of the claims, as illustrated in Table 2 below. According to BCBS-IL claims data, approximately $14 million of the billing was for purported dates of service prior to November 2023, when CLEAR LABS changed its registered agent from Individual 1 to SUFIYAN. As noted above, and as described in more detail below, law enforcement has traced $1,470,652 in payments on the claims to date, all of which was paid out in the form of paper checks deposited into bank accounts for which SUFIYAN was the sole signatory. Based on my training and experience, the volume, pattern, and timing of the claims submitted is extremely uncommon for a legitimate provider and is indicative of fraud.

26.     Table 2 below illustrates the months during which BCBS-IL members purportedly received laboratory testing services from CLEAR LABS for the CPT codes at issue, according to the claims BCBS-IL received from CLEAR LABS. As set forth in the chart, the dates of service for those CPT codes spanned from January 2, 2023, through March 25, 2024.

### TABLE 2

| Date of Service (Month/Year) | Number of Patients | Total Units | Total Billed Amount | Total Paid Amount |
|---|---|---|---|---|
| January 2023 | 30 | 96 | $16,639.68 | $939.55 |
| February 2023 | 14 | 45 | $7,720.63 | $375.82 |
| March 2023 | 133 | 399 | $69,158.67 | $2,283.57 |
| April 2023 | 612 | 1,839 | $318,753.87 | $3,190.57 |
| May 2023 | 597 | 1,791 | $310,513.25 | $1,103.58 |
| June 2023 | 720 | 2,160 | $374,472.02 | $1,825.47 |
| July 2023 | 1,684 | 8,262 | $1,432,125.18 | $16,695.82 |
| August 2023 | 4,373 | 25,041 | $4,341,411.04 | $230,540.31 |
| September 2023 | 4,371 | 21,855 | $3,789,267.3 | $330,673.85 |

12

| October 2023 | 4,347 | 21,411 | $3,711,998.22 | $333,785.96 |
| November 2023 | 4,339 | 20,871 | $3,618,476.05 | $334,160.52 |
| December 2023 | 4,326 | 29,307 | $5,080,751.10 | $353,053.62 |
| January 2024 | 3,985 | 24,810 | $4,301,130.79 | $115,309.50 |
| February 2024 | 3,466 | 11,304 | $1,959,540.72 | $24,105.38 |
| March 2024 | 219 | 1,653 | $286,514.49 | $284.16 |
| April 2024 | 0 | 0 | $0 | $0 |
| May 2024 | 0 | 0 | $0 | $0 |

27.     Based upon a review of BCBS-IL claims data, BCBS_IL received claims from CLEAR LABS for dates of service dating back to January 2023, and every month thereafter until March 2024. As demonstrated in Table 1 above, the initial claims BCBS-IL received in February 2024 from CLEAR LABS reflected "back billing" for dates of service up to twelve months in the past. Based on my training and experience investigating health care fraud, billing this number of patients up to twelve months after the purported service date is uncommon and indicative of potential fraud.

*BCBS-IL Member Complaints and Interviews*

28.     BCBS-IL recorded member complaints received through the BCBS-IL Fraud Hotline by either telephone or through BCBS-IL's website. A review of BCBS-IL member complaints about CLEAR LABS revealed a large volume of complaints submitted between February 2024 and November 2024. These member complaints contained allegations of billing for services or items not provided, services not rendered, and identity theft.

29.     Law enforcement officials interviewed BCBS-IL member A.L. on or about May 13, 2025. A.L. recalled that A.L.'s BCBS-IL insurance was billed for an usually high number of COVID tests within a short period of time in the early months of 2024. A.L. did not recognize the names of any lab entities that billed for the COVID

13

tests. A.L. informed agents that A.L. did not recognize the name CLEAR LABS, and stated there was no way the COVID tests listed on A.L.'s EOB's were performed. A.L. confirmed that A.L. did not take any COVID tests in February 2024 or March 2024. A review of BCBS-IL's claims data indicated that on April 22, 2024, BCBS-IL received 13 claims for 39 total units from CLEAR LABS – all under CPT codes 86328, 87637, and 87913 – for a total of $6,759.87 relating to A.L.. For these claims, BCBS-IL paid CLEAR LABS $2,657.05. Through the billing, CLEAR LABS claimed to have provided lab testing to A.L. on 13 separate dates of service between July 10, 2023, and March 25, 2024.

30. Law enforcement officials interviewed BCBS-IL member A.B.1 on or about October 9, 2025. A.B.1 informed agents that A.B.1 did not recognize the name CLEAR LABS. A.B.1 advised that A.B.1 usually went to a health care facility within the Advocate system or Walgreens if services such as COVID testing were needed. During the interview, A.B.1 accessed A.B.1's Advocate patient profile and Walgreens "app." A.B.1 could not locate any visits or information that would corroborate COVID testing from CLEAR LABS on February 21, 2024, a date of service for which CLEAR LABS billed BCBS-IL for COVID testing purportedly provided to A.B.1. A review of BCBS-IL's claims data indicated that on April 22, 2024, BCBS-IL received 15 claims for 45 total units from CLEAR LABS – all under CPT codes 86328, 87637, and 87913 – for a total of $7,799.85 relating to A.B.1. For these claims, BCBS-IL paid CLEAR LABS $2,898.60. Through the billing, CLEAR LABS claimed to have provided lab

testing to A.B.1 on 15 separate dates of service between July 10, 2023, and March 25, 2024.

31.    Law enforcement officials interviewed BCBS-IL member J.K. on or about October 20, 2025. J.K. stated that the name CLEAR LABS did not sound familiar to J.K.. J.K. worked in the field of health care information technology for many years, and was generally familiar with medical billing. J.K. believed J.K. had only taken a test via nasal swab twice, and neither occurred at CLEAR LABS. J.K. was 100 percent sure CLEAR LABS did not collect COVID test from J.K. on 15 separate dates. Additionally, J.K. has never had a test on their blood for COVID-related antigens. J.K. informed agents s/he noticed fraudulent claims being submitted under his/her name in the past, and reported this activity to BCBS-IL. J.K. stated that about 95 percent of the J.K.'s EOBs that containing references to fraudulent billing identified CLEAR LABS as the billing provider. These fraudulent services were from the time period of 2023 through 2024. A review of BCBS-IL's claims data indicated that on or about April 22, 2024, BCBS-IL received 15 claims for 90 total units from CLEAR LABS – all under CPT codes 86328, 87637, and 87913 – for a total of $15,599.70 relating to J.K. For these claims, BCBS-IL paid CLEAR LABS $2,898.60. Through the billing, CLEAR LABS claimed to have provided lab testing to J.K. on 15 separate dates of service between July 10, 2023, and March 25, 2024.

32.    Law enforcement officials interviewed BCBS-IL member F.F. on October 20, 2025. F.F. informed agents that F.F. remembered taking COVID tests

15

at the height of the COVID-19 pandemic at F.F.'s local Walmart or CVS. F.F. had never heard of an entity called CLEAR LABS. F.F. did not remember ever getting COVID-related tests from a blood specimen. When asked, in particular, about whether F.F. remembered being tested on February 21, 2024, F.F. reiterated that F.F. had not been tested in years. A review of BCBS-IL's claims data indicated that on April 22, 2024, BCBS-IL received 15 claims for 45 total units from CLEAR LABS – all under CPT codes 86328, 87637, and 87913 – for a total of $7,799.85 relating to F.F. For these claims, BCBS-IL paid CLEAR LABS $2,898.60. Through the billing, CLEAR LABS claimed to have provided lab testing to F.F. on 15 separate dates of service between July 10, 2023, and March 25, 2024.

33.     Law enforcement officials interviewed BCBS-IL member H.G. on or about October 20, 2025. H.G. stated H.G. was tested for COVID three or four times, all of which were through a Walgreens drive-through. H.G. believed the name CLEAR LABS sounded familiar, but did not know why. H.G. was 100 percent sure H.G. never had a COVID-related test requiring the provision of a blood specimen. When asked whether H.G. remembered being administered a COVID test on or about February 21, 2024, H.G. could not remember. On or about October 21, 2025, H.G. contacted agents, and informed them that H.G. found an email from approximately September 2023 that included the results with H.G.'s most recent COVID test. H.G. explained the COVID test was administered in the early part of 2023 – perhaps in January or February. Because of this, H.G. believed the tests billed by CLEAR LABS were not legitimate, especially any testing from February 2024. A review of BCBS-

IL's claims data indicated that on or about April 22, 2024, BCBS-IL received 15 claims for 45 total units from CLEAR LABS – all under CPT codes 86328, 87637, and 87913 – for a total of $7,799.85 relating to H.G.. For these claims, BCBS-IL paid CLEAR LABS $2,898.60. Through the billing, CLEAR LABS claimed to have provided lab testing to H.G. on 15 separate dates of service between July 10, 2023, and March 25, 2024.

34.     Law enforcement officials interviewed BCBS-IL member A.B.2 on or about October 21, 2025. A.B.2 had noticed numerous claims for COVID testing billed to A.B.2's insurance sometime after April 2024. A.B.2 was not familiar with a lab entity called CLEAR LABS, and has never been to 6318 N. Cicero Avenue, the location listed as the address of CLEAR LABS. A.B.2 stated that A.B.2 did not like needles, and therefore did not recall ever taking a blood test for CLEAR LABS or any other testing entity. A.B.2 stated that none of these tests occurred. A review of BCBS-IL's claims data indicated that on April 22, 2024, BCBS-IL received 15 claims for 45 total units from CLEAR LABS – all under CPT codes 86328, 87637, and 87913 – for a total of $7,799.85 relating to A.B.2. For these claims, BCBS-IL paid CLEAR LABS $2,898.60. Through the billing, CLEAR LABS claimed to have provided lab testing to A.B.2 on 15 separate dates of service between July 10, 2023, and March 25, 2024.

35.     As demonstrated above, CLEAR LABS billed BCBS-IL for members A.L., A.B.1, J.K., F.F., H.G., and A.B.2 for dates of service between July 10, 2023, and March 25, 2024. For each of these members, BCBS-IL received claims from CLEAR LABS for at least one date of service *after* the below-discussed site visit to CLEAR

17

LABS by a BCBS-IL investigator on or about February 16, 2024, during which the investigator observed that CLEAR LABS appeared to be empty and non-operational.

*Site Visits to CLEAR LABS*

36.    When CLEAR LABS initially enrolled with BCBS-IL on or about February 15, 2024, CLEAR LABS listed its address as 6318 N. Cicero Avenue, Chicago, Illinois. Investigators conducted site visits at that location, and did not find features consistent with an operational medical laboratory.

37.    First, an investigator from BCBS-IL visited the 6318 N. Cicero Avenue location on February 16, 2024. According to the investigator, the storefront of the business appeared to be vacant. Through the storefront window, the investigator could see an office space with minimal furniture and no equipment visible. The BCBS-IL investigator did not observe any lab equipment or supplies present at 6318 N. Cicero Avenue.

38.    The BCBS-IL investigator spoke with a neighbor of the 6318 N. Cicero Avenue location, who advised that no one had been present at the 6318 N. Cicero Avenue location for about one year. The neighbor stated s/he never saw anyone present at the location who was associated with a medical lab. The BCBS-IL investigator took photos of the location, one of which is included below:



39.     On or about Wednesday, January 15, 2025, an FBI Special Agent made a site visit to the CLEAR LABS location at 6318 N. Cicero Avenue. Based on the agent's observations at approximately 11:30 a.m., the business appeared to be closed as all window blinds were closed and no one appeared to be present inside the business. The agent located a piece of paper taped to the front door which read

Case: 1:25-cr-00791 Document #: 1 Filed: 12/11/25 Page 22 of 55 PageID #:22


"CLEAR LABS LLC," along with the address and listed the hours as Monday to Friday 9:00 AM – 5:00 PM and CLOSED Saturday and Sunday.

40.     Agents returned to CLEAR LABS on or about Friday, February 21, 2025, at approximately 10:25 a.m. Upon arrival, the business again appeared to be closed as all interior lights were turned off, and no one appeared to be present inside the business. The same paper sign containing the business name and business hours was visible on the front door of the business. No persons were seen entering or exiting CLEAR LABS during either site visit.

41.     On or about May 8, 2025, agents visited a neighboring business and interviewed an employee. The employee informed agents that the employee had not observed any individuals or activity in the past several years in the space next door at 6318 N. Cicero Avenue, the known locations of CLEAR LABS. The employee never saw any patients coming to the CLEAR LABS location, or observed any employees coming in or out of the property at 6318 N. Cicero Avenue. When asked by agents if they noticed an increase in activity or volume of persons at 6318 N. Cicero Avenue in 2023 and 2024, the employee responded in the negative.

*Interview of Landlord 1 and Records Produced by Landlord 1*

42.     According to records produced by Landlord 1, the owner of 6318 N. Cicero Avenue, as well as statements Landlord 1 made to agents during interviews, on or about June 18, 2023, Individual 1 signed a two-year lease for 6318 N. Cicero Avenue on behalf of CLEAR LABS, from July 1, 2023, through June 30, 2025. As part of the lease agreement process, Individual 1 provided Landlord 1 with a copy of

Individual 1's Illinois driver's license. On the lease application, dated June 16, 2023, Individual 1 identified Individual 1 as the "owner" of CLEAR LABS, which, at the time, was consistent with CLEAR LABS' IL-SOS filings. According to Landlord 1, from 2023 through in or around early 2025, Individual 1 would meet Landlord 1 outside of 6318 N. Cicero Ave. each month and pay CLEAR LABS' rent in cash. Individual 1 usually came alone and nobody else ever paid rent on behalf of CLEAR LABS. Landlord 1 had never met or seen SUFIYAN. Landlord 1 last communicated with Individual 1 on or about April 14, 2025 (soon before Individual 1's arrest and detention in Individual 1's pending bank fraud case). At the time, CLEAR LABS was at least two months behind on rent payments.

43.     During an interview with Landlord 1, on or about May 8, 2025, Landlord 1 told law enforcement s/he recently entered 6318 N. Cicero Avenue and had to "dust off" cobwebs inside the property. The space appeared to be mostly vacant and no business appeared to be conducted inside. In a subsequent interview, Landlord 1 told law enforcement s/he took photographs of the inside of the property at 6318 N. Cicero Avenue. On or about December 2, 2025, Landlord 1 provided these photographs to law enforcement, including photographs of what appear to be a laboratory hood and a centrifuge (another piece of lab equipment) that Landlord 1 observed inside the property on or about May 2, 2025.

44.     Based on the statements of S.N., CLEAR LABS' lab director, provided on or about December 3, 2025 (and further discussed below), Individual 1 is associated with multiple laboratories and could have brought the machine into 6318

N. Cicero Avenue any time prior to May 2, 2025. As noted above, at the time of the BCBS-IL site visit to 6318 N. Cicero Avenue, on or about February 16, 2024, the CLEAR LABS premises appeared empty and unused as of that time, consistent with the statements of S.N. that CLEAR LABS had not yet been set up to conduct any testing as of March 2024. Additionally, as described in more detail below, CLEAR LABS' bank records (as well as IDES records) show that CLEAR LABS was not paying for employees or lab supplies from November 2023 through February 2024.

*IDES Records*

45.     On or about November 20, 2024, a request for information to IDES confirmed that CLEAR LABS did not have an account with IDES during the time period of January 1, 2020, through November 20, 2024. Based on my training and experience, I know that employers in Illinois are required to pay unemployment insurance taxes and file quarterly reports with IDES reflecting the names and amounts paid to each of their employees on a quarterly basis. Based on my training and experience, the fact that an Illinois company does not have an account with IDES indicates that the company either has no employees or is failing to pay unemployment insurance taxes as required.

*BCBS-IL Letters to CLEAR LABS*

46.     According to BCBS-IL records, on or about February 26, 2024, BCBS-IL sent a letter to CLEAR LABS in which, BCBS-IL informed CLEAR LABS that it would be placed on Pre-Payment Review ("PPR"). PPR required all claims submitted by CLEAR LABS to BCBS-IL to be reviewed prior to a final determination or

payment. In the letter, BCBS-IL cited "billing for services not rendered" as the billing issue leading to the PPR. A BCBS-IL representative explained to agents that providers placed on PPR should not receive payment from BCBS-IL until they provided adequate records to support the billing. A BCBS-IL representative confirmed that as of October 22, 2025, BCBS-IL had not received any records from CLEAR LABS.[5]

47.    In a letter addressed to CLEAR LABS from BCBS-IL, dated April 11, 2024, BCBS-IL informed CLEAR LABS that the contract agreement between the two entities was being terminated, effective July 14, 2024. According to BCBS-IL, there is no record indicating that CLEAR LABS disputed this determination or requested that the contract continue.

48.    In a letter addressed to CLEAR LABS and SUFIYAN from BCBS-IL, dated July 15, 2024, BCBS-IL informed CLEAR LABS of an overpayment in the amount of $1,940,915.23, and requested a payment of the same. The letter stated that BCBS-IL "found a pattern of billing for services when members reported not receiving the billed services," and "BCBS-IL based this refund demand on the evidence that CLEAR LABS LLC billed for services that were not rendered." The letter also stated: "The volume of these complaints showed that this was not inadvertent, but part of a pattern of intentionally inaccurate billing." A BCBS-IL representative confirmed the

---

[5] Based on BCBS-IL's claims data, BCBS-IL did make payment on a relatively small number of claims submitted by CLEAR LABS after the initiation of the PPR on or about February 26, 2024, despite the fact that CLEAR LABS never furnished medical records in response to the PPR. A BCBS-IL representative stated that these claims should not have been paid as a result of the PPR but nonetheless were paid due to an error in BCBS-IL's systems.

letter was sent to SUFIYAN and CLEAR LABS at the 6318 N. Cicero Avenue location on July 15, 2024, but was returned as undeliverable. The BCBS-IL representative confirmed that CLEAR LABS had not made any repayment to BCBS-IL.

49.    As discussed below, during the same approximate time period that BCBS-IL was sending the above-referenced notification letters to CLEAR LABS, BCBS-IL was also mailing paper checks to CLEAR LABS, all of which were deposited into CLEAR LABS' bank accounts for which SUFIYAN was the sole signatory and many of which were endorsed with SUFIYAN's signature.

*CMS Survey Report*

50.    According to records produced by the Illinois Department of Public Health ("IDPH"), on or about October 19, 2023, CLEAR LABS submitted a Form CMS-116 CLIA Application for Certification for the purpose of reporting a "change of director & Location." The name of the new laboratory director was identified as S.N. and the new facility address was listed as 6318 N. Cicero Ave., Chicago, Illinois. The application indicated that CLEAR LABS would maintain "hours of laboratory testing" from 9:00 a.m. to 5:00 p.m. on every day of the week and would be conducting only "SARS-CoV2, RT-PCR-NP" tests using an "iAMP-Covid-19 Detection Kit" manufactured by "qTOWER" at a test volume of 15,500 tests per year. The application identified SUFIYAN as the owner of CLEAR LABS and, in the signature block for the application, bore a signature below the name of SUFIYAN that appears to match

other exemplars of the signatures of SUFIYAN from bank signature cards. Above SUFIYAN's name and signature appeared the following language from the form:

> The applicant hereby agrees that such laboratory identified herein will be operated in accordance with applicable standards found necessary by the Secretary of Health and Human Services to carry out the purposes of Section 353 of the Public Health Service Act as amended. The applicant further agrees to permit the Secretary, or any Federal officer or employee duly designated by the Secretary, to inspect the laboratory and its operations and its pertinent records at any reasonable time and to furnish any requested information or materials necessary to determine the laboratory's eligibility or continued eligibility for its certificate or continued compliance with CLIA requirements.

51. According to a Form CMS-2567 survey report dated March 22, 2024, and produced by IDPH, on or about March 4, 2024, a CMS surveyor attempted to conduct a "scheduled . . . CMS initial certification survey of [CLEAR LABS] on 03/04/2024 at 9:00 a.m." According to the report, at approximately 9:35 a.m. on March 4, 2024, the surveyor observed the "LO [laboratory owner] taking photographs of the outside of . . . . CLEAR LABS LLC, 6318 N Cicero Ave, Chicago, IL, 60646." The surveyor then interviewed the laboratory owner and confirmed with the laboratory owner that the survey "would be completed as scheduled." Instead of allowing the surveyor to access CLEAR LABS, however, at approximately 9:43 a.m., the laboratory owner "returned to his vehicle and left the laboratory." In the column of the report labeled "Provider's Plan of Correction," which appears above what appears to be the hand-signature of S.N. as "Lab Director," S.N. appears to have written: "Please terminate the lab and remove my name as LD [lab director] effective immediately as the form is processed. Owner of the lab is not responsive to any emails or calls regarding the lab and the survey."

25

According to CMS records, CLEAR LABS' CLIA license was terminated on or about April 5, 2024.

*Interview of Lab Director S.N.*

52.     On or about December 3, 2025, investigators conducted a telephonic interview of S.N. During the interview, S.N. stated that she became the lab director for CLEAR LABS in or around October 2023, soon after a colleague put S.N. in touch with an individual S.N. knew as "Sam," who used the phone number 872-985-7367 and the email address shijan606@gmail.com.[6] According to S.N., "Sam" was the only person associated with CLEAR LABS with whom S.N. communicated and S.N. only communicated with "Sam" via phone and email. S.N. never met in person with "Sam" or anyone else associated with CLEAR LABS. Initially, S.N. understood "Sam" to be a contractor for CLEAR LABS, which was owned by SUFIYAN, and that "Sam" was helping to set up the lab. Over time, however, S.N. observed that "Sam" acted as if he owned and controlled CLEAR LABS.

53.     S.N. agreed to serve as the lab director for CLEAR and understood that her primary responsibilities would be helping to set up the lab, including by reviewing documentation related to validations of lab equipment, reviewing standard operating procedures, and assisting with instrument set-up, all of which were common practice when setting up a new lab. When setting up a lab, S.N. typically would visit the lab in person to ensure that all equipment was set up properly before testing began. After S.N. became the lab director for CLEAR LABS, however, "Sam" never sent S.N. any

---

[6] "Sam" is consistent with a shortened version of the first name of Individual 1.

documentation relating to CLEAR LABS' standard operating procedures or equipment and "Sam" never gave S.N. access to CLEAR LABS' premises, which S.N. understood to be 6318 N. Cicero Avenue in Chicago. "Sam" eventually stopped responding to S.N.'s emails and phone calls. In the last update S.N. did receive from "Sam," which occurred via a phone call, "Sam" indicated to S.N. that he was still trying to find the right lab instruments and validation to begin testing. To S.N.'s knowledge, CLEAR LABS never hired any employees.

54. Consistent with the above-referenced Form CMS-2567 survey report dated March 22, 2024 produced by IDPH, S.N. recalled that the Commission on Laboratory Accreditation ("COLA") attempted to conduct a survey of CLEAR LABS. S.N. confirmed that she handwrote the request on the survey report that CMS "terminate the lab and remove my name as LD [lab director] effective immediately as the form is processed" because the "owner of the lab is not responsive to any emails or calls regarding the lab and the survey."

55. When agents informed S.N. that CLEAR LABS had billed private insurance approximately $29 million in lab testing, S.N. expressed surprise that CLEAR LABS had been billing at all because the set-up process for CLEAR LABS had never been completed. When agents reviewed with S.N. the definitions of each of the CPT codes that CLEAR LABS billed to BCBS-IL (87637, 87913, and 86328), S.N. confirmed that CLEAR LABS was never set up to perform the tests described in the C PT code definitions.

56. In addition to CLEAR LABS, "Sam" also recruited S.N. to serve as the lab director for two other laboratories. S.N. terminated S.N.'s lab director position at both of those labs as well due to the failure of "Sam" to respond to S.N.'s communications related to the laboratories.

**B. SUFIYAN Knowingly Participated in the Scheme to Defraud BCBS-IL and Knowingly Conducted Financial Transactions Involving Proceeds of the Scheme with the Intent to Conceal the Nature, Location, Source, Ownership and Control of the Proceeds.**

57. As set forth in more detail below, there is probable cause to believe that SUFIYAN knowingly participated in the scheme to defraud BCBS-IL and knowingly conducted financial transactions involving proceeds of the fraud scheme with the intent to conceal the nature, location, source, ownership and control of the proceeds, including by: signing and/or causing the submission of regulatory filings on behalf of CLEAR LABS to IL-SOS, IDPH, and CMS; opening and serving as the sole signatory for at least approximately five bank accounts in the name of CLEAR LABS at four different financial institutions; opening an additional 22 bank accounts in his own name and in the names of five different pass-through entities controlled by SUFIYAN, and falsely claiming that the pass-through entities either were in the "clothing" business or provided services to healthcare companies; serving as the sole authorized contact for CLEAR LABS' account with Office Ally, the clearinghouse CLEAR LABS used to submit claims to BCBS-IL; endorsing and depositing into CLEAR LABS' bank accounts paper checks sent from BCBS-IL as payment for fraudulent claims submitted by CLEAR LABS; and rapidly moving the proceeds of

the fraudulent claims out of the CLEAR LABS accounts by, among other things, transferring the proceeds to accounts in his own name, transferring proceeds to accounts in the names of four of the pass-through entities for which SUFIYAN was the sole signatory, purchasing cashier's checks with bogus references to "Inventory" (because as shown above, CLEAR LABS was non-operational and thus had no inventory) in the memo line, and withdrawing proceeds in cash.

### 1. Regulatory Filings

58. As noted above, according to records produced by IDPH, on or about October 19, 2023, SUFIYAN signed a Form CMS-116 CLIA Application for Certification on behalf of CLEAR LABS in which he: (1) identified S.N. as CLEAR LABS' new lab director; (2) identified 6318 N. Cicero Ave. as CLEAR LABS' new address; and (3) indicated that CLEAR LABS would maintain "hours of laboratory testing" from 9:00 a.m. to 5:00 p.m. on every day of the week and would be conducting only "SARS-CoV2, RT-PCR-NP" tests using an "iAMP-Covid-19 Detection Kit" manufactured by "qTOWER" at a test volume of 15,500 tests per year. SUFIYAN signed the application above, which included a certification that CLEAR LABS would, among other things, be "operated in accordance with applicable standards found necessary by the Secretary of Health and Human Services to carry out the purposes of Section 353 of the Public Health Service Act as amended."

59. As noted above, according to IL-SOS records, on or about November 1, 2023, CLEAR LABS submitted to IL-SOS an "Articles of Amendment" form stating that SUFIYAN was CLEAR LABS' sole manager. A signature appearing to be that of

SUFIYAN appears above SUFIYAN's handwritten name as CLEAR LABS' "MGR," below the statement: "I affirm, under penalties of perjury, having authority to sign hereto, that these Articles of Amendment are to the best of my knowledge and belief, true, correct, and complete."

60.     As noted above, according to Medicare's Application Data Report (ADR), on or about February 29, 2024, an individual identifying himself as SUFIYAN electronically signed a provider enrollment application on behalf of CLEAR LABS in which SUFIYAN was added as CLEAR LABS' sole "Authorized Official," sole "Managing Employee," sole "5% or Greater Direct/Indirect Owner," sole "Managing Employee," and "President," as of January 1, 2024. According to the ADR, CLEAR LABS identified as its bank account an account ending x2248 at U.S. Bank for which SUFIYAN was the sole signatory. On the application, SUFIYAN's phone number was listed as 872-XXX-7367 and SUFIYAN's email address was listed as shijan606@gmail.com, which are the same phone number and email address that, according to S.N., were used by "Sam" to communicate with S.N.

    2. *Bank Account Openings for CLEAR LABS, Pass-Through Entities, and SUFIYAN – November 2023*

61.     According to bank records, over the course of one week beginning on or about November 3, 2023 (two days after CLEAR LABS submitted "Articles of Amendment" to IL-SOS bearing SUFIYAN's signature and identifying SUFIYAN as CLEAR LABS' sole manager), SUFIYAN opened five different bank accounts for CLEAR LABS at four different banks, as depicted in the chart below. For each account, CLEAR LABS' address was listed as 6318 N. Cicero Avenue.

| Account Name | Bank | Account Number | Signatory | Description of SUFIYAN's Position | Opening Date |
|---|---|---|---|---|---|
| CLEAR LABS | PNC | x8508 | SUFIYAN | Manager | 11/3/2023 |
| CLEAR LABS | PNC | x8874 | SUFIYAN | Manager | 11/3/2023 |
| CLEAR LABS | Old National Bank | x0524 | SUFIYAN | Authorized Signer | 11/7/2023 |
| CLEAR LABS | Huntington National Bank | x1903 | SUFIYAN | "Pres/Owner/CEO" | 11/8/2023 |
| CLEAR LABS | US Bank | x2248 | SUFIYAN | Owner | 11/10/2023 |

62.     Based on my training and experience, it is unusual for a medical business to open new bank accounts at four different banks within one week. Based on my training and experience, as well as the training and experience of other investigators familiar with this investigation, fraudulent medical businesses often open accounts at multiple financial institutions as a way to mitigate against the risk that any one financial institution freezes the business's account at that institution or that the government obtains a seizure warrant for one of the accounts.

63.     During the same week beginning November 3, 2023, SUFIYAN also opened up a total of six additional bank accounts at the same four banks for the entities Soft Solutions Inc., Mahek Import & Export Inc., Shima 1 Inc., and Hillot International Inc. According to the account opening documents, SUFIYAN identified the location of each business as 6318 N. Cicero Ave., the same location as CLEAR

LABS. According to the account opening documents produced by Old National Bank for Soft Solutions Inc. and Mahek Import & Export Inc., SUFIYAN indicated that both entities (purportedly located at 6318 N. Cicero Ave.) were in the "apparel" or "clothing" business.

64.     IL-SOS records indicate that SUFIYAN incorporated Hillot International Inc. on or about November 6, 2023, approximately four days before he opened the Hillot International account at US Bank. Similarly, IL-SOS records show that SUFIYAN was added as an officer and registered agent for each of Mahek Import & Export Inc., Shima 1 Inc., and Soft Solutions Inc. in the days before he opened up bank accounts for those entities.

65.     Bank records for the above referenced eleven accounts in the names of CLEAR LABS, Hillot International Inc., Mahek Import & Export Inc., Shima 1 Inc., and Soft Solutions Inc. show that from the time the accounts were opened in November 2023 through on or about February 28, 2024 (the day before CLEAR LABS started receiving and depositing checks from BCBS-IL), there was little or no transaction activity in any of the accounts. More specifically, excluding service charges, transactions associated with purchases of checkbooks, and a total of approximately 13 deposits of $100 each, the only transactions to occur in any of the accounts prior to February 29, 2024, were a single "Cash-In" ATM deposit of $6,000 into the CLEAR LABS account ending x8508 at PNC on or about November 10, 2023, and a corresponding withdrawal of $6,000 by SUFIYAN from that same account that same day.

66. The lack of transaction activity in the CLEAR LABS accounts is consistent with IDES records indicating CLEAR LABS had no employees, the observations of neighbors of 6318 N. Cicero that the premises appeared to be unused, the BCBS-IL site visit to 6318 N. Cicero on or about February 16, 2024, and S.N.'s understanding that CLEAR LABS was not operational prior to the attempted survey on or about March 4, 2024. Likewise, the lack of transaction activity is inconsistent with CLEAR LABS' claims to BCBS-IL that it was performing thousands of lab tests during the months from November 2023 through February 2024. Additionally, the lack of transaction activity in the accounts of Hillot International Inc., Mahek Import & Export Inc., Shima 1 Inc., and Soft Solutions Inc. prior to February 29, 2024, indicates that none of those entities were operating "clothing" or "apparel" businesses, or any other type of business. As discussed in more detail below, soon after SUFIYAN began depositing checks from BCBS-IL into the CLEAR LABS accounts in late February 2024, SUFIYAN began distributing proceeds from the CLEAR LABS accounts to the accounts in the names of Hillot International Inc., Mahek Import & Export Inc., and Shima 1 Inc., as well as SUFIYAN's personal accounts and accounts in the names of other entities. Based on the bank records, the accounts in the names of Hillot International Inc., Mahek Import & Export Inc., and Shima 1 Inc., appear to have served no purpose other than receiving and then further distributing the proceeds of claims submitted to BCBS-IL by CLEAR LABS and one other laboratory.

3.      *Office Ally Account*

33

67.     According to records obtained from Office Ally, the clearinghouse that CLEAR LABS used to submit claims electronically to BCBS-IL, CLEAR LABS opened its account with Office Ally on or about February 5, 2024. SUFIYAN was identified as the sole "Authorized Contact" on the account for CLEAR LABS and SUFIYAN's email address was listed as "smirsajidali@gmail.com." According to Google subscriber records, SUFIYAN is listed as the subscriber for smirsajidali@gmail.com. According to Office Ally records, two "UserIDs" were associated with the CLEAR LABS account. The "UserID" called "ClearLabsllc" ("User ID" 1039837) was created on or about February 5, 2024, listed the name of the user as "CLEAR LABS LLC," and the "User Type" as "Provider (Parent)." The "UserID" called "ClearLabsllc SA" ("User ID" 1039838) was created on or about February 7, 2024, listed the name of the user as SUFIYAN, and listed the "User Type" as "Security Administrator (Child User)." According to the "User Information" for both of those two "UserIDs", the email address "smirsajidali@gmail.com" was associated with each of the "UserIDs."

68.     According to Office Ally records, on or about February 6, 2024, the email address "smirsajidali@gmail.com" sent an email to Office Ally stating: "Hi, Please find the attached ERA enrollment form and process our request ASAP. Thank you! Mir." The email attached an "Availity ERA Enrollment Form" on behalf of CLEAR LABS, purportedly electronically signed by SUFIYAN, in which CLEAR LABS indicated it wished to enroll with "BCBS of Illinois." According to Office Ally records, on or about February 15, 2024, and February 16, 2024, the "smirsajidali@gmail.com" email address sent two identical emails to Office Ally stating: "Please find the attached ERA

34

enrollment form for BCBS Community health plan of IL." Each email attached an identical "Availity ERA Enrollment Form" on behalf of CLEAR LABS, purportedly electronically signed by SUFIYAN, in which CLEAR LABS indicated it wished to enroll with "Blue Cross Community Health Plans."

69. According to Office Ally records, Office Ally issued four monthly invoices to CLEAR LABS at 6318 N. Cicero Avenue from February 29, 2024, through June 30, 2024, in which Office Ally reported that it had submitted 22,976 claims in February 2024, 41,766 claims in March 2024, 4,337 claims in April 2024, and 120 claims in June 2024.[7] Office Ally sought a total of approximately $3,214.40 from CLEAR LABS through the invoices. However, according to Office Ally records, the CLEAR LABS account was disabled on or about December 5, 2024 due to a "Past Due Balance" of the full $3,214.40. Claims data produced by Office Ally identifies BCBS-IL as the sole payer on all of the claims CLEAR LABS submitted through Office Ally.

### 4. *BCBS-IL Enrollment Application*

70. As noted above, according to BCBS-IL records, on or about February 15, 2024, a BCBS-IL enrollment form was submitted for CLEAR LABS, listing SUFIYAN as the "President" and "Office Contact Name" for CLEAR LABS, and listing 6318 N. Cicero Avenue as the address for CLEAR LABS. The enrollment form purported to be electronically signed by SUFIYAN.

### 5. *Additional Bank Account Openings for CLEAR LABS and Pass-Through Entities (February 2024)*

---

[7] Office Ally did not produce a monthly invoice for May 2024.

71.    On or about February 13-14, 2024, days after CLEAR LABS began submitting claims to BCBS-IL through Office Ally but before BCBS-IL had made payment on any claims, SUFIYAN opened an additional four bank accounts at two banks in the names of CLEAR LABS, Mahek Import & Export Inc., and SUFIYAN. According to account opening documents for the Mahek Import & Export Inc. account SUFIYAN opened at Citibank, SUFIYAN described the entity's business as "Wholesale General Merchandise." SUFIYAN was the sole signer on all of the new accounts.

72.    As noted above, at the time that SUFIYAN opened these accounts, he had already opened numerous accounts in the names of CLEAR LABS, Mahek Import & Export Inc., and himself, all of which were largely dormant. Nevertheless, according to the Citibank account opening documents for the Mahek Import & Export Inc. account ending x7801, SUFIYAN represented that Mahek Import & Export Inc. had three employees, $612,237 in "Annual Gross Revenue," and $375,000 in "Annual Net Profit." SUFIYAN again represented on the account opening documents for both of the Mahek Import & Export Inc. accounts that the entity was located at 6318 N. Cicero Ave. SUFIYAN also identified his own address as 6318 N. Cicero Ave. on the account opening documents for his new personal account ending x0191 at Fifth Third Bank.

73.    As discussed in more detail below, on or about February 29, 2024, after checks from BCBS-IL to CLEAR LABS (many of which were endorsed with SUFIYAN's signature) began to be deposited into the CLEAR LABS accounts at

Huntington National Bank, U.S. Bank, PNC Bank, and Fifth Third Bank, SUFIYAN began moving the proceeds of those payments out of the CLEAR LABS accounts, including by transferring proceeds to accounts in the names of Mahek Import & Export Inc., Shima 1 Inc., and Hillot International Inc. During this same time period, SUFIYAN also continued to open up new bank accounts in the names of Mahek Import & Export Inc., Shima 1 Inc., SUFIYAN, and another entity called One Stop Health Service Inc.[8] According to Citibank account opening documents for One Stop Health Service Inc., SUFIYAN represented that the entity "provide[d] services to home health care agencies, hospitals doctors clinics etc." and claimed the entity had three employees, $867,893 in "Annual Gross Revenue," and $375,000 in "Annual Net Profit." As discussed in more detail below, however, bank records for each of the One Stop Health Service Inc. accounts showed the accounts served no apparent other purpose other than receiving proceeds of fraudulent claims submitted by CLEAR LABS and another laboratory and then further distributing those proceeds to SUFIYAN and others.

74. According to Time Bank records for an account SUFIYAN opened on or about September 11, 2024 in the name of Shima 1 Inc., SUFIYAN described Shima 1 Inc.'s business as "Mens Clothing."

---

[8] According to IL-SOS records, on or about March 12, 2024, SUFIYAN electronically signed an "Application for Reinstatement" on behalf of One Stop Health Service Inc., in which SUFIYAN identified himself as the entity's president and 6025 N. Cicero Ave. as the entity's address. That same day, SUFIYAN also electronically signed an "Annual Report" identifying himself as the sole president, secretary, and director for One Stop Health Service Inc., and a "Statement of Change of Registered Agent" identifying himself as the entity's new registered agent. According to IL-SOS records, a few weeks later, on or about March 27, 2024, the registered agent of One Stop Health Service, Inc. changed from SUFIYAN to Individual 5.

75.     In total, from November 2023 through September 2024, SUFIYAN opened at least 27 bank accounts at seven different banks in the names of CLEAR LABS, Mahek Import & Export Inc., Shima 1 Inc., Hillot International Inc., Soft Solutions Inc., One Stop Health Service Inc., and SUFIYAN. SUFIYAN was the sole signatory on all 27 accounts.

> 6.     *SUFIYAN Deposited BCBS-IL and HCSC Checks Into CLEAR LABS' Bank Accounts and Rapidly Distributed the Proceeds of CLEAR LABS' Fraudulent Claims*

76.     Beginning on or about February 23, 2024, BCBS-IL began making payment to CLEAR LABS via physical checks, all of which were made by two BCBS payment entities, BCBS-IL and HCSC. As shown in the chart below, bank records show that the checks from BCBS-IL and HCSC were deposited into four of the above-referenced CLEAR LABS bank accounts at Fifth Third Bank (x7924), PNC Bank (x8508), U.S. Bank (x2248), and Huntington National Bank (x1903). As noted above, SUFIYAN was the sole signatory for each of those accounts.

| **Account** | **Date Range of Deposits** | **Number of deposits** | **Total Amount of Payments** |
|---|---|---|---|
| CLEAR LABS – Fifth Third x7924 | 04/10/2024 – 06/04/2024 | BCBS-IL: 7 | BCBS-IL: $156,419. |
| CLEAR LABS – PNC – x8508 | 04/10/2024 – 08/28/2024 | BCBS-IL: 3 | BCBS-IL: $12,453. |
| CLEAR LABS – US Bank – x2248 | 02/29/2024 -03/18/2024 | BCBS-IL: 4 HCSC-IL: 1 | BCBS-IL: $322,059. HCSC: $754,174. |
| CLEAR LABS – Huntington | 2/29/2024 -10/15/2024 | BCBS-IL: 4 | BCBS-IL: $135,319. HCSC: $90,228. |

38

| National Bank – x1903 | | HCSC-IL: 2 | |
|---|---|---|---|

77.     Of the approximately $1,748,327.78 paid to CLEAR LABS based on its claims to BCBS-IL per the BCBS-IL claims data, approximately $1,470,652 was deposited via checks from BCBS-IL or HCSC into one of the above four CLEAR LABS bank accounts (the "Tier One Accounts"). Although checks deposited into the PNC Bank and US Bank accounts for CLEAR LABS were endorsed with a stamp, many of the checks deposited into the CLEAR LABS accounts at Huntington National Bank and Fifth Third Bank bore what appears to be SUFIYAN's signature based on comparisons to SUFIYAN's signature on his Social Security card and New York driver's license. Once the BCBS-IL and HCSC funds were deposited into the Tier One Accounts, SUFIYAN rapidly moved the funds out of the Tier One Accounts by transferring funds to accounts in the name of SUFIYAN, transferring funds to accounts in the names of Hillot International Inc., One Stop Health Service Inc., Shima 1 Inc., and Mahek Import & Export Inc., withdrawing funds in cash, and purchasing cashier's checks payable to third party entities, often with bogus references to "Inventory" in the memo line.

78.     According to bank records, as shown in the chart below, from on or about February 29, 2024, through in or around November 2024, from the Tier One Accounts, SUFIYAN withdrew in cash or transferred to other accounts under his control a total of approximately $604,004:

| Method of Withdrawal from Tier One Account | Approx. Total Amount |
|---|---|

| | |
|---|---|
| Transfers to Accounts in Name of SUFIYAN | $226,744 |
| Transfers to Hillot International Inc. Account | $115,600 |
| Transfers to Mahek Import & Export Inc. Accounts | $91,750 |
| Cash Withdrawals | $88,800 |
| Transfers to One Stop Health Service Inc. Accounts | $56,010 |
| Transfers to Shima 1 Inc. Accounts | $35,100 |
| **Total** | **$604,004** |

79. In addition to the above-described cash withdrawals and transfers to other accounts controlled by SUFIYAN, SUFIYAN also moved fraud proceeds out of the Tier One accounts by purchasing at least approximately nine cashier's checks for a total of approximately $559,000 made out to three entities (Company 1, Company 2, and Company 3) registered to Individual 6. At least six of the cashier's checks made out to Company 1, Company 2 and Company 3 that SUFIYAN purchased contain the word "Inventory" in the memo line. Although investigators are still waiting for bank records for Company 2 and Company 3, bank records for the Company 1 bank account at PNC Bank that received the cashier's checks from CLEAR LABS show that in the first seven full months after the account was opened in August 2023 leading up to April 2024 (when Company 1 started receiving payments from CLEAR LABS), the only transactions in the account other than service charges were three deposits of $40 each. The Company 1 bank records thus contain no indications that, prior to receiving payments from CLEAR LABS in April 2024, Company 1 was purchasing equipment, supplies or anything else that could have been sold to CLEAR LABS as "Inventory." Based on the above-discussed evidence indicating that CLEAR LABS was not in fact conducting any testing (and thus had no need to purchase "Inventory"), including the statements of S.N., the site visits to CLEAR LABS, the statements of CLEAR LABS'

neighbors, IDES records, and CLEAR LABS bank records showing minimal transaction activity from November 2023 through February 2024, I believe the purchases of the cashier's checks made out to Company 1, Company 2, and Company 3 with the word "Inventory" in the memo line were not intended to purchase "Inventory" and instead were intended to conceal the nature, location, source, ownership, and control of fraud proceeds.

80.     Based on a review of the bank records, outflows from the Tier One Accounts typically followed quickly after deposits of checks from BCBS-IL and HCSC. For example, on or about Thursday, April 18, a $754,352 check from BCBS-IL (the largest single check from BCBS-IL to CLEAR LABS) was deposited into the CLEAR LABS account at US Bank ending x2248. On or about Tuesday, April 23, SUFIYAN transferred $100,000 to the Hillot International US Bank account (x2230) and $100,000 to SUFIYAN's US Bank account (x2255). On or about April 24, SUFIYAN withdrew $293,000, with $95,000 going to purchase a cashier's check to Company 2 for "Inventory", $95,000 going to Company 3 for "Inventory," $95,000 going to Company 1 for "Inventory," and $8,000 going out to SUFIYAN in cash. Below is an image of the withdrawal slip for the $293,000 withdrawal bearing SUFIYAN's signature:

81.     Based on my review of the signature on the withdrawal slip, I believe it is consistent with SUFIYAN's signature on the signature cards for each of the accounts he opened, as well as SUFIYAN's signature on his Social Security card and New York driver's license, which, as depicted below in redacted form, SUFIYAN provided to Citibank when opening the One Stop Health Service Inc. account ending x8019:

42





82. On or about April 25, SUFIYAN then went back and largely repeated what he had done one day prior, purchasing another $95,000 cashier's check for Company 2, another $95,000 cashier's check for Company 3, and withdrawing another $8,000 in cash. On or about April 26 and April 29, SUFIYAN transferred another $5,200 to his personal account at US Bank (x2255) and, on or about April 29, he transferred $3,000 to the Hillot International account at US Bank (x2230). On or about April 29-30, SUFIYAN withdrew $15,000 in cash, purchased a $10,000 cashier's check made out to himself, purchased a $10,000 cashier's check made out to Mahek Import & Export Inc., and purchased a $20,000 cashier's check to Company 4, purportedly for a "loan return," even though the CLEAR LABS bank records show no incoming payments from Company 4. Through the above transactions, in just one

43

week, SUFIYAN distributed out all $754,352 in proceeds, leaving the account balance at just $152. None of the proceeds appear to have been spent on employees, supplies, credit card expenditures, or any of the anticipated day-to-day expenses of operating a lab.

> **7.** *SUFIYAN Continued to Distribute Proceeds of CLEAR LABS' Fraudulent Claims from the Accounts of Hillot International Inc., Mahek Import & Export Inc., Shima 1 Inc., and One Stop Health Service Inc.*

83.    As described in more detail below, after SUFIYAN transferred proceeds of CLEAR LABS' fraudulent claims to BCBS-IL from the Tier One Accounts into accounts in the name of Hillot International Inc. (x2230), Mahek Import & Export Inc. (x1916 and x7890), Shima 1 Inc. (x8058), and One Stop Health Service Inc. (x8948 and x2157) (the "Tier Two Accounts"), SUFIYAN rapidly moved the proceeds out of the Tier Two Accounts by transferring the proceeds to his personal accounts, transferring proceeds further among the Tier Two Accounts, transferring proceeds back to Tier One Accounts, conducting cash withdrawals, and purchasing cashier's checks made out to Company 1, Company 2 and Company 3. Bank records for the Tier Two Accounts show that none of the Tier Two Accounts were used to make any regular payments for employees, supplies, or any other business expenses that might be associated with legitimate, operational clothing or healthcare companies. As a result, I believe that SUFIYAN conducted the transfers from the Tier One Accounts to the Tier Two Accounts and the subsequent transfers and withdrawals from the Tier Two Accounts with the intent to conceal the nature, location, source, ownership and control of the proceeds of CLEAR LABS' fraudulent claims to BCBS-IL.

*Distributions of Fraud Proceeds from Hillot International Inc. (x2230)*

84.     According to bank records, during April 2024, the only credits into the Hillot International account at US Bank (x2230) were three transfers from the CLEAR LABS account at US Bank (x2248) for a total of $113,000.

- On or about April 17, 2024, SUFIYAN transferred $10,000 from the CLEAR LABS account at US Bank (x2248) to the Hillot International account at US Bank (x2230). That same day, SUFIYAN transferred the $10,000 back to the CLEAR LABS account at US Bank (x2248).

- On or about April 23, 2024, SUFIYAN transferred $100,000 from the CLEAR LABS account at US Bank (x2248) to the Hillot International account at US Bank (x2230). Two days later, on or about April 25, 2024, SUFIYAN signed a withdrawal slip withdrawing $95,000 from the Hillot International account (x2230) to purchase a $95,000 cashier's check to Company 1. The next day, on or about April 26, 2024, SUFIYAN transferred to his personal account at US Bank (x2255) the $5,000 remaining from the $100,000 Hillot International received from CLEAR LABS on April 23, 2024.

- On or about April 29, 2024, SUFIYAN transferred $3,000 from the CLEAR LABS account at US Bank (x2248) to the Hillot International account at US Bank (x2230). On or about May 13, 2024, SUFIYAN signed a check for $2,800 from the Hillot International account at US Bank (x2230) to himself, which SUFIYAN endorsed and caused to be deposited into an as-yet unidentified bank account on or about May 14, 2024.[9]

85.     Additionally, on or about June 3 and June 5, 2024, SUFIYAN made two transfers totaling approximately $2,600 from the CLEAR LABS US Bank account (x2248) to the Hillot International US Bank account (x2230). On June 5, 2024, the same day as the second transfer, SUFIYAN withdrew $3,000 from the Hillot International US Bank account.

---

[9] In the interim between April 29, 2024, and May 13, 2024, two transactions occurred in the Hillot International account at US Bank (x2248). On or about May 1, 2024, a $10,000 PNC Bank cashier's check with Company 1 listed as the "Remitter" was deposited into the Hillot International account at US Bank (x2248). SUFIYAN then used the funds from that cashier's check to write a $10,000 check back to Company 1 on or about May 9, 2024.

86.     On or about July 23, 2024, the Hillot International bank account at US Bank (x2230) was closed with a balance of $102.75. Based on a review of the Hillot International bank records, the purpose of the payments from CLEAR LABS to Hillot International appears to have been to funnel fraud proceeds from CLEAR LABS to SUFIYAN and Company 1. Hillot International bank records contain no indications that Hillot International was an operational company that was providing goods or services from its registered location at 6318 N. Cicero Avenue or anywhere else.

*Distributions of Fraud Proceeds from Mahek Import & Export Inc. (x1916 and x7890)*

87.     From March 2024 through May 2024, SUFIYAN transferred approximately $81,750 from Tier One accounts at to the Mahek Import & Export Inc. accounts at Huntington National Bank (x1916) and Fifth Third Bank (x7890).

- On or about March 20, 2024, SUFIYAN transferred $3,000 from CLEAR LABS account at Huntington National Bank (x1903) to the Mahek Import & Export Inc. account at Huntington National Bank (x1916). On or about March 21 and 26, 2024, SUFIYAN transferred a total of $3,000 to SUFIYAN's personal account at Huntington National Bank (x0511).

- On or about April 15, 2024, SUFIYAN transferred $5,000 from the CLEAR LABS account at Fifth Third Bank (x7924) to the Mahek Import & Export Inc. account at Fifth Third Bank (x7890). Two days later, on or about April 17, 2024, SUFIYAN withdrew $5,000 from the Mahek Import & Export Inc. account at Fifth Third Bank (x7890) via a withdrawal slip.

- From on or about April 17-22, 2024, SUFIYAN transferred $69,000 from the CLEAR LABS account at Huntington National Bank (x1903) and approximately $20,000 from SUFIYAN's personal account at Huntington National Bank (x0511) to the Mahek Import & Export Inc. account at Huntington National Bank (x1916). On April 22, 2024, the same day as two of the incoming transfers, SUFIYAN withdrew $89,500 from the account ending x1916, transferred $100 to his personal account at Huntington National Bank

(x0511),        and        withdrew        $250        in        cash.[10]

- On or about May 7, 2024, SUFIYAN transferred $4,000 from the CLEAR LABS account at Huntington National Bank (x1903) to the Mahek Import & Export Inc. account at Huntington National Bank (x1916). From June 4-5, 2024, SUFIYAN transferred to the Mahek Import & Export Inc. account at Huntington National Bank (x1916) a total of $5,000 from SUFIYAN's personal bank account at Huntington National Bank (x0511), $900 from the One Stop Health Service Inc. account at Huntington National Bank (x2157), and $100 from the CLEAR LABS account at Huntington National Bank (x1903). On or about June 5, 2024, SUFIYAN withdrew the $10,000 from those deposits from the Mahek Import & Export Inc. account at Huntington National Bank (x1916).

88.    Contrary to SUFIYAN's representations on account opening statements for Mahek Import & Export Inc. that the company was in the business of "Mens Clothing Import Export", bank statements for the Mahek Import & Export Inc. accounts at Huntington National Bank and Fifth Third Bank do not reflect any transactions consistent with the operation of a legitimate clothing company, such as payments for shipping, supplies, or employees.

*Distributions of Fraud Proceeds from One Stop Health Service Inc. (x8948 and x2157)*

89.    From March 2024 through April 2024, SUFIYAN transferred $55,910 from Clear Labs to two different accounts in the name of One Stop Health Service Inc. at Fifth Third (x8948) and Huntington National Bank (x2157). With those proceeds (and about another $7,000 received from SUFIYAN's personal account and

---

[10] The Huntington National Bank statement for the account ending x1916 for the month of April 2024 reflects a debit for a "check" for $89,500 (no. 495148) on or about April 22, 2024. Although Huntington National Bank provided a copy of a withdrawal slip for $89,500 on that same date, no corresponding check was provided. Based on the bank statement's reference to a particular check number for a check in the amount of $89,500, I believe the $89,500 withdrawal on or about April 22, 2024 likely was used to fund the purchase of a cashier's check for which law enforcement has not yet obtained a copy.

Mahek), SUFIYAN withdrew $5,000 in cash, transferred $2,207 to personal accounts, transferred $5,900 to Mahek Import & Export Inc., and transferred $50,000 back to the CLEAR LABS account at Huntington National Bank (x1903). Many of the transfers from One Stop Health Service Inc. to Mahek Import & Export Inc. and CLEAR LABS occurred on the same day as transfers for the same dollar amount from Mahek Import & Export Inc or CLEAR LABS to One Stop Health Service Inc. These same-day transfers back-and-forth for the same dollar amounts appear to have served no legitimate economic purpose. Contrary to SUFIYAN's representations on Citibank account opening forms that One Stop Health Service Inc. was in the business of "provid[ing] services to home health care agencies, hospitals doctors clinics etc," One Stop Health Service Inc.'s bank records showed One Stop Health Service Inc. served no purpose, other than to receive payments of fraud proceeds from CLEAR LABS and then send money back to CLEAR LABS or to other accounts controlled by SUFIYAN.

*Distributions of Fraud Proceeds from Shima 1 Inc. (x8058)*

90.    On or about March 8, 2024, SUFIYAN withdrew $30,000 from the CLEAR LABS account at Huntington National Bank (x1903) to purchase a $30,000 cashier's check (no. 2017379886) to the order of Shima 1, with the remitter listed as the account number for the CLEAR LABS account at HNB (x1903). That same day, SUFIYAN deposited the check into the Shima 1 account at PNC Bank (x8058). SUFIYAN then withdrew the full value of the check ($30,000) over the course of two in-branch withdrawal transactions on or about March 15 and March 18, 2024.

48

91.     On or about April 15, 2024, SUFIYAN electronically transferred $5,000 from the Clear Labs account at PNC Bank (x8508) to the Shima 1 account at PNC Bank (x8058). SUFIYAN then withdrew the $5,000 from the Shima 1 account at PNC Bank (x8058) via an in-branch withdrawal transaction on or about May 18, 2024.

92.     Contrary to SUFIYAN's representations on account opening documents for a Shima 1 Inc. account at Time Bank that Shima 1 Inc. was in the "Mens Clothing" business, bank statements for the Shima 1 Inc. account at PNC Bank and Time Bank that received proceeds of CLEAR LABS' fraudulent claims contains no indications that Shima 1 Inc. was in fact operating as a clothing company.

> 8.     *SUFIYAN Used Mahek Import & Export Inc. Bank Statements to Apply for Office Leases and Mahek Import & Export Inc. Funds to Make Lease Payments*

93.     On or about October 1, 2025, agents interviewed Employee 1, a vice president at Real Estate Company 1, a real estate management company located in Chicago. Employee 1 positively identified SUFIYAN based on a driver's license photograph of SUFIYAN and explained that s/he had seen SUFIYAN on approximately five different occasions in connection with leases SUFIYAN signed for two commercial properties located at 4178 West Montrose Avenue and 4411 North Kimball Avenue in Chicago. According to Employee 1 and records produced by Real Estate Company 1, as part of the lease application for one of the properties, SUFIYAN provided Real Estate Company 1 with a copy of his New York driver's license and bank statements for Mahek Import & Export Inc. account at Huntington National Bank ending x1916. SUFIYAN told Employee 1 that he wanted to use one of the

49

properties for a "medical office" where patients could go for lab testing and wanted to use the second space as a storage location for a medical device business. As deposits for the leases, SUFIYAN provided Real Estate Company 1 with two Huntington National Bank cashier's checks, each in the amount of $4,050 (check number 2018341361, dated 12/30/2024 and check number 2018341324, dated 01/22/2025), each of which listed the remitter as Mahek Import & Export Inc. Employee 1 personally observed SUFIYAN sign both leases, which Real Estate Company 1 provided to agents. As depicted below, SUFIYAN's signatures on the leases appear to match SUFIYAN's signature on the above-referenced bank signature cards, withdrawal slips, endorsement lines, as well as on SUFIYAN's New York driver's license and Social Security card:



94.     Law enforcement also interviewed Employee 2, a receptionist for Real Estate Company 1. When shown a driver's license photo of SUFIYAN, Employee 2 identified SUFIYAN as the individual she believed to be the leaseholder for one of Real Estate Company 1's properties. Employee 2 believed that she saw SUFIYAN when he came to Real Estate Company 1 in or around January 2025 with two other individuals.

C. **Count 1 – April 22, 2024 CLEAR LABS' Claim for COVID Testing Services Purportedly Provided to BCBS-IL Member A.B.2**

95. Based on the evidence described above, there is probable cause to believe that SUFIYAN caused CLEAR LABS to submit false and fraudulent claims to BCBS-IL for COVID tests which never occurred. This includes, for purposes of Count 1 of the Complaint, a claim received by BCBS-IL on or about April 22, 2024, for the provision of COVID testing services to BCBS-IL member A.B.2 on or about February 21, 2024 (five days after the BCBS-IL site visit to 6318 N. Cicero Avenue on or about February 16, 2024) that did not occur and for which BCBS-IL paid CLEAR LABS $241.55 on or about May 13, 2024.

D. **Count 2 – April 24, 2024 Withdrawal of $293,000 from CLEAR LABS Account x2248**

96. Based on the evidence described above, there is probable cause to believe that, on or about April 24, 2024, SUFIYAN knowingly conducted a financial transaction, namely a withdrawal of $293,000 (using a withdrawal slip signed by SUFIYAN ) from the CLEAR LABS account at US Bank (x2248) for which SUFIYAN was the sole signatory, which SUFIYAN used to the purchase a $95,000 cashier's check to Company 1 for "Inventory," a $95,000 cashier's check to Company 2 for "Inventory," a $95,000 cashier's check to Company 3 for "Inventory," and to take out $8,000 in cash. As described above, the withdrawal was funded with the deposit of a $754,174.11 check from BCBS-IL to CLEAR LABS on or about April 18, 2024, which was based on fraudulent claims for COVID tests that were never performed. SUFIYAN, as the sole signatory on CLEAR LABS' bank accounts, knew that CLEAR

51

LABS was not paying for employees or lab supplies and knew that the withdrawal and subsequent purchases of cashier's checks with references to "Inventory" on the memo lines were intended to conceal the nature, location, source, ownership and control of fraud proceeds.

## CONCLUSION

97.     In summary, according to witnesses and records obtained by law enforcement, SUFIYAN, through CLEAR LABS, caused to be submitted false and fraudulent claims to BCBS-IL for the purported service of COVID tests under CPT codes 87637, 87913, and 86328. CLEAR LABS charged BCBS-IL for performing COVID tests on members who never received such services. The fraudulent claims included a CLEAR LABS claim received by BCBS-IL on or about April 22, 2024, for the purported provision of COVID testing services to BCBS-IL member A.B.2 on or about February 21, 2024, which BCBS-IL paid in the amount of $241.55.

98.     Additionally, SUFIYAN engaged in transactions involving the fraudulently obtained proceeds of the health care fraud, conducted with the intent to conceal the nature, location, source, ownership, and/or control of the proceeds, including the withdrawal by SUFIYAN of $293,000 from the CLEAR LABS account at US Bank (x2248) on or about April 24, 2024.

99.     Based upon the foregoing facts, I submit that there is probable cause to believe that MIR SAJID ALI SUFIYAN committed the offenses of health care fraud, in violation of Title 18, United States Code, Section 1347, and money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

FURTHER AFFIANT SAYETH NOT.

_____
Tony Benka
Special Agent, FBI


Sworn to and affirmed by telephone the 11th day of December, 2025

_____
Honorable Keri L. Holleb Hotaling
United States Magistrate Judge

53